IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ERIC C. REICHE, | ) | |
| | ) | Civil Action No. 10-1519 |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Magistrate Judge Lisa Pupo Lenihan |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | Electronic Filing |
| | ) | |
| Defendant | ) | |

# MEMORANDUM OPINION

I. **INTRODUCTION**

Eric C. Reiche ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381 - 1383f ("Act"). This matter comes before the court on cross motions for summary judgment. (ECF Nos. 10, 14). The record has been developed at the administrative level. For the following reasons, Plaintiff's Motion for Summary Judgment is GRANTED, in part, and DENIED, in part, and Defendant's Motion for Summary Judgment is DENIED.

II. **PROCEDURAL HISTORY**

Plaintiff filed for DIB and SSI with the Social Security Administration on August 7, 2008, claiming an inability to work due to disability beginning April 5, 2008. (R. at 155 – 67)[1]. Plaintiff was initially denied benefits on October 16, 2008. (R. at 104 – 13). A hearing was

---
[1] Citations to ECF Nos. 6 – 6-9, the Record, *hereinafter*, "R. at __."

scheduled for November 30, 2009, and Plaintiff appeared to testify represented by counsel. (R. at 10). A vocational expert also testified. (R. at 10). The Administrative Law Judge ("ALJ") issued her decision denying benefits to Plaintiff on December 30, 2009. (R. at 88 – 99). Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, which request was denied on September 14, 2010, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 3 – 7).

Plaintiff filed his Complaint in this court on November 15, 2010. (ECF No. 3). Defendant filed his Answer on January 18, 2011. (ECF No. 5). Cross motions for summary judgment followed. (ECF Nos. 10, 14).

### III. STATEMENT OF THE CASE

The facts relevant to the present case are limited to those records that were available to the ALJ when rendering her decision. (R. at 7). All other records newly submitted[2] to the Appeals Council or this court will not be considered, here, and will not inform the decision of this court. *See Matthews v. Apfel*, 239 F.3d 589, 592, 594 – 95 (3d Cir. 2001).[3]

#### A. General Background

---

[2] Exhibits 18F – 19F; R. at 444 – 552.

[3] The Appeals Council may decline review of a claimant's case when the ALJ's decision is not at odds with the weight of the evidence on record. *Matthews*, 239 F.3d at 592. In such a case, a district court can only review that evidence upon which the ALJ based his or her decision. *Id.* at 594 – 95. As a result, new evidence presented by a claimant to the Appeals Council, but not reviewed, is not within the purview of a district court when judging whether substantial evidence supported an ALJ's determination. *Id.* Such is the case at present. Additionally, Plaintiff failed to make the required showing under *Szuback v. Secretary of Health and Human Services*, 745 F.2d 831 (3d Cir. 1984), for remand to reconsider the case in light of newly submitted evidence not considered by the ALJ when making his decision. Therefore, the case will not be remanded for this purpose, and Exhibits 18F – 19F (R. at 444 – 552) will not be discussed.

Plaintiff was born on June 19, 1987, and was twenty-two[4] years of age at the time of his administrative hearing. (R. at 13). Plaintiff graduated high school and completed two years of college. (R. at 15). Prior employment included work as a cashier/ laborer at a Goodwill donation center, and as a cashier/ laborer at a Dollar General. (R. at 17 – 18). He was last employed for approximately nine months in 2007 - 2008, and has had no sources of income since that time. (R. at 14, 18 – 19). He resided with a friend because his family could not afford to support him. (R. at 14). Plaintiff subsisted on food stamps, and received medical benefits from the state. (R. at 14). Plaintiff did not know how to drive, and depended upon his mother for transportation. (R. at 14 – 15). Plaintiff took prescription medication for blood pressure, depression, and anxiety. (R. at 21 – 22).

B. Treatment History

Plaintiff was seen by pediatric cardiologist Prapti Kanani, M.D. approximately every six months for diagnosed bicuspid aortic valve, mitral valve prolapse, dilated aortic root and ascending aorta, mild aortic insufficiency, and connective tissue disorder[5]. (R. at 271 – 80, 343 – 48, 351 – 55, 358 – 75, 441 – 443). Despite suffering from a significantly dilated aorta, Dr. Kanani found that medication therapy was preventing Plaintiff's conditions from progressing appreciably. (R. at 271 – 80, 343 – 48, 351 – 55, 358 – 75, 441 – 443). It was noted throughout his treatment with Dr. Kanani – extending from January 27, 2005 through December 10, 2009 – that Plaintiff rarely experienced chest pains, and had no symptoms of shortness of breath, palpitations, or syncope. (R. at 271 – 80, 343 – 48, 351 – 55, 358 – 75, 441 – 443). When Plaintiff did experience chest pain, it was often attributed to anxiety. (R. at 271 – 80, 343 – 48,

---

[4] Plaintiff is defined as a, "Younger Person," at all times relevant to this determination. 20 C.F.R. §§ 404.1563, 416.963.

[5] Plaintiff's connective tissue disorder was presumptively diagnosed as Marfan's Syndrome, but did not meet the criteria exactly and overlapped with other similar disorders. (R. at 332 – 42).

3

351 – 55, 358 – 75, 441 – 443). Dr. Kanani often noted that Plaintiff suffered from depression, bipolar disorder, and anxiety, and had difficulty with management of these conditions due to an inability to afford medication. (R. at 271 – 80, 343 – 48, 351 – 55, 358 – 75, 441 – 443). Plaintiff did see a therapist. (R. at 271 – 80, 343 – 48, 351 – 55, 358 – 75, 441 – 443). Plaintiff was typically cleared by Dr. Kenani to engage in low dynamic recreational sports, but could not participate in isometric, contact, or competitive sports, or any activity which could result in direct hits to his chest. (R. at 271 – 80, 343 – 48, 351 – 55, 358 – 75, 441 – 443).

By May 13, 2008, Dr. Kanani concluded that the severity of Plaintiff's condition warranted a discussion with pediatric surgeons regarding surgical intervention. (R. at 279). Plaintiff was evaluated by pediatric cardiothoracic surgeon Peter Wearden, M.D. on June 25, 2008 with respect to potential surgical intervention for his heart condition. (R. at 283 – 84). Dr. Wearden was troubled by Plaintiff's intermittent chest pain, but did not feel Plaintiff was a candidate for surgery at that time. (R. at 283 – 84). Due to the risk associated with the required operation, it was determined that Plaintiff's condition should be monitored until his condition began to worsen before proceeding with surgery. (R. at 283 – 84).

In March of 2007, Plaintiff visited his primary care physician, Scott Tyson, M.D., seeking a medical excuse for missing work due to intermittent back pain. (R. at 263). Dr. Tyson noted Plaintiff's history of back pain and physical therapy for treatment. (R. at 263). Dr. Tyson prescribed Naprosyn for Plaintiff's pain. (R. at 263).

Plaintiff sought treatment at a pain clinic for his back pain on November 25, 2008. (R. at 329 – 31). At that time, Plaintiff was seen by Lisa Weidner, M.D. for a lumbar epidural injection. (R. at 329 – 31). Prior to the procedure, Plaintiff was diagnosed with lumbar spondylolithesis at the L5 – S1 level of the spine, and spondylosis at the L5 level of the back.

(R. at 329 – 31). At a follow-up with Dr. Weidner in December of 2008, it was noted that Plaintiff experienced a reaction to the injection requiring a blood patch to reverse its effects. (R. at 327 – 28). Yet, the injection, in conjunction with ongoing physical therapy and medication management at the time, relieved much of his pain. (R. at 327 – 28). However, Plaintiff did not wish to consider further injections due to the adverse reaction, instead preferring to continue with physical therapy and prescribed medication. (R. at 327 – 28).

Plaintiff received medication and counseling for his psychological conditions from Ravi Kant, M.D. and Julie Pastorius, L.C.S.W. The record indicated that Plaintiff was seen by Ms. Pastorius from October of 2008 until February of 2009. (R. at 428 – 33). When he began therapy with Ms. Patorius, Plaintiff was diagnosed with major depression and bipolar disorder, and was given a global assessment of functioning ("GAF") score of 40. (R. at 428 – 33). Plaintiff was noted to be self-abusive, depressed, anxious, and withdrawn. (R. at 428 – 33). He also exhibited low self-esteem and admitted to substance abuse. (R. at 428 – 33). Ms. Patorius attributed Plaintiff's depression, anxiety, and panic attacks to his health problems. (R. at 428 – 33). Some suicidal ideation, without plan, was noted. (R. at 428 – 33).

Dr. Kant treated Plaintiff and managed his medication from January of 2009 until October of 2009. (R. at 435). Initially, Plaintiff complained of stress/anxiety, depression, difficulty sleeping, self-mutilation, and suicidal ideation. (R. at 435). He also had not been medicated for two years prior to his treatment with Dr. Kant. (R. at 435). At Plaintiff's first follow up appointment with Dr. Kant after initiating a new medication regimen, Plaintiff claimed that he felt much calmer, his anxiety was controlled, his sleep was adequate, he was without suicidal ideation, and he was tolerating his medications well. (R. at 435). Over time, however, psychosocial stressors frequently exacerbated Plaintiff's psychological issues and would require

medication adjustments. (R. at 435). Plaintiff's mental state generally declined over the course of treatment with Dr. Kant, Plaintiff primarily suffering from the effects of depression and significant anxiety. (R. at 435).

    C.  <u>Functionality Assessments</u>

On October 4, 2008, Plaintiff was examined by Lawrence Haddad, Ph.D. on behalf of the Bureau of Disability Determination. (R. at 290 – 96). Following a mental status examination, Dr. Haddad diagnosed Plaintiff with depression and bipolar disorder. (R. at 290 – 96). Dr. Haddad made these findings with a high degree of confidence. (R. at 290 – 96). He noted Plaintiff's hygiene and appearance to be adequate, and his demeanor to be cooperative. (R. at 290 – 96). Plaintiff's history of connective tissue disorder and his heart condition also were noted. (R. at 290 – 96). Plaintiff indicated that he had complained of depression since approximately the sixth grade, and later, of difficulties with anxiety. (R. at 290 – 96). Plaintiff also discussed occasional suicidal thoughts, and feelings of hopelessness and helplessness. (R. at 290 – 96).

Dr. Haddad did not observe any indications of significant anxiety. (R. at 290 – 96). Psychomotor slowing, affective range and intensity restriction, some difficulty with attention and concentration, social withdrawal, and a preoccupation with physical conditions were all observed by Dr. Haddad. (R. at 290 – 96). However, Plaintiff was articulate and coherent, was without perceptual disturbances, was intelligent and exhibited normal thought, and had intact memory, impulse control, and social judgment. (R. at 290 – 96). Dr. Haddad concluded that Plaintiff would experience marked impairment in interacting appropriately with the public, slight impairment interacting with supervisors, moderate impairment interacting with co-workers, marked impairment responding appropriately to work pressures in a usual work setting, and

6

slight impairment responding appropriately to changes in a routine work setting. (R. at 290 – 96). Plaintiff was capable of managing benefits in his own interests. (R. at 290 – 96).

On October 10, 2008, Raynaldi Torio, M.D. completed a physical residual functional capacity ("RFC") assessment of Plaintiff. (R. at 302 – 08). He diagnosed Plaintiff with Marfan's Syndrome and dilated aortic root. (R. at 302 – 08). Dr. Torio concluded that Plaintiff was capable of occasionally lifting twenty pounds, frequently lifting ten pounds, standing/walking six hours of an eight hour work day, and sitting six hours. (R. at 302 – 08). Plaintiff was not otherwise limited. (R. at 302 – 08). He supported his conclusions by stating that Plaintiff's daily activities were not significantly limited in relation to Plaintiff's alleged symptoms. (R. at 302 – 08). Plaintiff's treatment for his physical conditions was characterized as conservative in nature, no surgeries had been scheduled, and Plaintiff did not engage in any physical therapy. (R. at 302 – 08). As such, Plaintiff's subjective complaints were found only partially credible. (R. at 302 – 08).

On October 14, 2008, Richard Heil, Ph.D. completed a mental RFC assessment of Plaintiff. (R. at 309 – 12). Plaintiff was diagnosed with bipolar disorder and depression. (R. at 309 – 12). Plaintiff was not markedly limited in any area of functioning, and was otherwise found to be moderately or not significantly limited in all areas. (R. at 309 – 12). Dr. Heil supported his conclusion that Plaintiff was capable of maintaining full-time employment by noting his post-secondary education, and certain findings by Dr. Haddad which bolstered this conclusion. (R. at 309 – 12). Dr. Haddad's findings of marked impairment were determined to be against the weight of evidence on record, however, and were accorded little consideration. (R. at 309 – 12).

Dr. Kanani completed a functional capacity assessment of Plaintiff on December 14, 2009. (R. at 436 – 40). Dr. Kanani stated that Plaintiff's attention and concentration would occasionally be affected by his pain and other physical symptoms caused by his heart condition and connective tissue disorder. (R. at 436 – 40). He also found Plaintiff to be incapable of tolerating low stress due to the anxiety originating from his physical ailments. (R. at 436 – 40). Plaintiff was not determined to be limited with respect to walking, and could walk, sit, and/or stand at least two hours of the day. (R. at 436 – 40). Plaintiff was, however, significantly restricted with respect to his ability to lift and carry, and was never to carry ten or more pounds. (R. at 436 – 40). Plaintiff was also to avoid sustained flexion of the neck, holding his head in a static position, twisting, stooping, crouching, and climbing ladders. (R. at 436 – 40). He could only rarely be required to climb stairs. (R. at 436 – 40). Dr. Kanani indicated that these functional limitations could be expected to last at least twelve months. (R. at 436 – 40). Plaintiff might also be expected to miss four or more days of work per month due to his anxiety. (R. at 436 – 40).

    D.  <u>Administrative Hearing</u>

At his hearing, Plaintiff testified that he did not feel he could maintain full-time employment due to complications arising from a diagnosed connective tissue disorder, including an enlarged aorta. (R. at 19). Plaintiff voluntarily terminated his former employment at Dollar General because back pain prevented him from performing as required; however, he did not seek further employment primarily as a result of his worsening heart condition. (R. at 19, 26). Plaintiff explained that his cardiologist severely restricted the kinds of activities in which Plaintiff could partake based upon the strain these activities could place on Plaintiff's heart. (R. at 19 – 20, 34). He also was to avoid activities in which he could be bumped or struck on his

chest. (R. at 37). His weakened/ enlarged aorta required surgical repair to avert potential rupture, yet surgery was to be put off until the aorta dilated a further two centimeters because the procedure was high-risk. (R. at 19 – 20, 38). Plaintiff conceded that once he had the required surgery, he would be fully capable of returning to some sort of full-time work. (R. at 21).

With respect to his alleged back pain, Plaintiff explained that it was centered in his lower back and often sent shooting pains into his lower abdomen, without warning. (R. at 22). Plaintiff was treated by a physical therapist for his back pain, and since that time had continued with recommended exercises at home. (R. at 23). The pain would come and go frequently, and standing for more than one hour generally made it worse. (R. at 24 – 26). Sitting was not an issue for Plaintiff; and, he could walk up to one mile. (R. at 25 – 26). However, he could do almost no lifting. (R. at 26). An attempt was made to treat his back pain with an epidural injection; however, the procedure resulted in an allergic reaction which left Plaintiff very ill and required a visit to the emergency room to receive a blood patch to reverse the epidural's effects. (R. at 24).

Plaintiff explained that since learning of the severity of his heart condition, his anxiety had interfered with his normal functioning, and often made it difficult for him to pay attention or concentrate. (R. at 27 – 28). Being among as few as three other people in one place could bring on an anxiety attack. (R. at 28). He avoided taking the bus because of the people, and avoided social situations, generally. (R. at 30). He had attacks as often as every day. (R. at 35). Plaintiff found it difficult to pick up the phone to talk, and communicated mostly via text messages. (R. at 36). Plaintiff was seeing a psychiatrist and therapist for his mental conditions, but had recently switched therapists. (R. at 29). He saw each at least once per month. (R. at 29).

9

Plaintiff testified that he only slept approximately five hours each night. (R. at 30). On a day-to-day basis he would cook, clean, wash dishes, care for his cat, paint, draw, and write. (R. at 30 – 31, 33). He would also go shopping for necessities with his mother on a regular basis. (R. at 30 – 31). Most days he would lie on the couch, however. (R. at 33). He did not leave his apartment often, and could spend several days at a time in bed due to depression and lack of motivation. (R. at 30 – 31, 33).

Following Plaintiff's testimony, the ALJ asked the vocational expert whether a hypothetical person of Plaintiff's age, educational background, and work experience would qualify for a significant number of jobs in the national economy if limited to light exertional work involving no contact with the public, only occasional contact with co-workers or supervisors, a low-stress work environment, and no production-rate pace work. (R. at 41). The vocational expert replied that such a person would be eligible for jobs as a "housekeeper/cleaner," with 100,000 positions available in the national economy, as an "office worker," with 30,000 positions available, and as a "produce sorter," with 10,000 positions available. (R. at 42). However, the hypothetical person would be required to stay on task at least eighty five percent of each work day. (R. at 43).

The ALJ followed up by asking what jobs would be available to such a person if the hypothetical were to reflect limitation to sedentary work only, and additional limitations in the way of a discretionary sit/stand option and work involving only one or two-step tasks. (R. at 43). The vocational expert responded that no jobs would be available to a person so limited. (R. at 43).

**IV.** **STANDARD OF REVIEW**

Judicial review of the Commissioner's final decisions on disability claims is provided by statute. 42 U.S.C. §§ 405(g)[6] and 1383(c)(3)[7]. Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based, and the court will review the record as a whole. *See* 5 U.S.C. §706. When reviewing a decision, the district court's role is limited to determining whether substantial evidence exists in the record to support an ALJ's findings of fact. *Burns v. Barnhart,* 312 F.3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)(quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F.Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). In short, the court can only test the adequacy of an ALJ's decision based upon the rationale explicitly provided by the

---

[6] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[7] Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

ALJ; the court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d. Cir. 1986).

To be eligible for social security benefits under the Act, a claimant must demonstrate that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986). The ALJ must utilize a five-step sequential analysis when evaluating whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, Appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §404.1520(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is

able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

V.   **DISCUSSION**

In her decision, the ALJ concluded that Plaintiff suffered from medically determinable severe impairments in the way of connective tissue disorder, dilated aortic root, mitral valve prolapse, bicuspid aortic valve, degenerative disc disease, depression, and anxiety. (R. at 90). Despite these impairments, the ALJ determined that Plaintiff was capable of engaging in substantial gainful employment on a full-time basis, but limited to light exertional work, with only occasional contact with co-workers or supervisors, no contact with the general public, a low stress environment, and no production rate work on a regular and sustained basis. (R. at 94). Consistent with the testimony of the vocational expert, a significant number of jobs in the national economy were available to Plaintiff. (R. at 98 – 99).

Plaintiff objects to the determination of the ALJ, arguing that she erred in failing to fully credit the limitations findings of Dr. Kanani, in improperly discrediting Plaintiff's subjective complaints of pain and limitation, and – as a result – in creating an RFC assessment that was not reflective of Plaintiff's true functional limitations. (ECF No. 11 at 6 – 15). First, with respect to the ALJ's determinations regarding Plaintiff's psychologically-based limitations, the court does not find that there was error. Plaintiff fails to present evidence of non-exertional, psychological limitation inconsistent with, or not accommodated by, the findings of Drs. Heil and Haddad. This is particularly true in light of the ALJ's reliance upon the more restrictive findings of Dr. Haddad, and the conclusion that Dr. Kanani's findings with respect to Plaintiff's psychological

13

state were entitled to little weight because he only treated Plaintiff for a heart condition. (R. at 97).

However, the court will not similarly find the ALJ's determinations regarding Plaintiff's physical limitations were entirely proper. With respect to the findings of a treating medical source – such as Dr. Kanani – the Court of Appeals for the Third Circuit has held that their opinions may be entitled to great weight – considered conclusive unless directly contradicted by evidence in a claimant's medical record – particularly where the physician's findings are based upon "continuing observation of the patient's condition over a prolonged period of time." *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008); *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (citing *Rocco v. Heckler* 826 F.2d 1348, 1350 (3d Cir. 1987)). However, a showing of contradictory evidence and an accompanying explanation will allow an ALJ to reject a treating physician's opinion outright, or accord it less weight. *Id.*

Dr. Kanani's medical findings were entitled to significant weight in light of his substantial treatment history – as a pediatric cardiologist – regarding Plaintiff's heart conditions. Yet, it was not unreasonable for the ALJ to reject Dr. Kanani's postural limitations findings in light of Dr. Kanani's long-established allowance for Plaintiff to engage in certain recreational sports/activities. Dr. Kanani's frequent medical opinion – explicitly acknowledged and relied upon by the ALJ in her decision – indicated that Plaintiff was fully capable of low dynamic sports/activities. (R. at 96 – 97). However, this allowance also frequently included a finding that Plaintiff was to avoid isometric, contact, and competitive sports, such as weightlifting. (R. at 271 – 80, 343 – 48, 351 – 55, 358 – 75, 441 – 443). Obviously, the potential strain put upon Plaintiff's heart by the activity of lifting was an issue. It fully comported with Dr. Kanani's later functional assessment precluding Plaintiff from work requiring the lifting of ten pounds or more.

14

It was clear error for the ALJ to conclude otherwise, simply because Dr. Kanani did not find Plaintiff's ability to walk to be limited.

Walking/standing is analyzed separately from lifting in functional assessments because these are obviously distinguishable activities. The ALJ provided no evidence that the ability to engage in one activity is equivalent to the ability to engage in the other. The ALJ made a medical conclusion she was not qualified to make. The ALJ presented no objective medical evidence indicating that walking created the same strain upon Plaintiff's heart that lifting ten or more pounds would create. No objective medical evidence was provided which indicated that Dr. Kanani's limitations findings were inconsistent. As such, the ALJ's RFC does not necessarily reflect all of Plaintiff's credibly established limitations. This requires remand.

## VI. CONCLUSION

Based upon the foregoing, the ALJ failed to adequately justify her decision to reject certain of Dr. Kanani's findings. As a result, this court will not conclude that substantial evidence supported the ALJ's decision. "On remand, the ALJ shall fully develop the record and explain [her] findings… to ensure that the parties have an opportunity to be heard on the remanded issues and prevent *post hoc* rationalization" by the ALJ. *Thomas v. Commissioner of the Social Security Administration*, 625 F.3d 798, 800 – 01 (3d Cir. 2010). *See also Ambrosini v. Astrue*, 727 F.Supp.2d 414, 432 (W.D.Pa. 2010). Testimony need not be taken, but the parties should be permitted input via submissions to the ALJ. *Id.* at 801 n. 2.

Accordingly, Plaintiff's Motion for Summary Judgment is granted, to the extent it seeks further review by the ALJ, and denied, to the extent it seeks a reversal and entry of final judgment in favor of Plaintiff; Defendant's Motion for Summary Judgment is denied; and, the

decision of the ALJ is vacated and the case remanded for further consideration not inconsistent with this opinion. An appropriate Order follows.

August 4, 2011

                                          Lisa Pupo Lenihan
                                          United States Magistrate Judge

cc/ecf: All counsel of record.